**2122-CC08680**

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS COUNTY, MISSOURI

FRANSCHELL LITTLE Individually, And In A
Representative Capacity For All Persons
Identified By RSMo. § 537.080
<u>Address</u>
4321 Swan Ave.
St. Louis, MO 63110

**Plaintiff**

v.

**BEAUVAIS MANOR HEALTHCARE &
REHAB CENTER, LLC**
<u>Serve:</u>
Jeff Davis
3625 Magnolia Avenue
St. Louis, MO 63110

**BEAUVAIS MANOR PROPERTY, LLC**
<u>Serve:</u>
Jeff Davis
3625 Magnolia Avenue
St. Louis, MO 63110

**SW FINANCIAL SERVICES COMPANY**
<u>Serve:</u>
Sheldon Wolfe
6651 N. Drake Avenue
Lincolnwood, IL 60712

**SHELDON WOLFE**
<u>Serve:</u>
6651 N. Drake Avenue
Lincolnwood, IL 60712

**ALBERT MILSTEIN**
<u>Serve:</u>
7437 North Skokie Boulevard
Skokie, IL 60077

**MOSHE HERMAN**
<u>Serve:</u>
9038 Tamaroa Ter
Skokie, Illinois 60076

Case No.:
Division:

JURY TRIAL DEMAND

1



Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

JAMEKAH GARRETT-HUGHES
<u>Serve:</u>
3625 Magnolia Ave
St. Louis, MO 63110

**Defendants.**

### PLAINTIFF'S PETITION FOR DAMAGES

### <u>PLAINTIFF</u>

1.      Gregory Little ("Decedent") died on March 18, 2020, from an avoidable pressure injury on Decedent's sacrum that ultimately developed sepsis osteomyelitis, thereby necessitating his placement on hospice and ultimately his death

2.      Plaintiff Franchell Little is a surviving child of Decedent, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to RSMo § 537.080.

### <u>DEFENDANTS</u>

3.      Plaintiff incorporates by reference the allegations previously set forth and further allege as follows.

### Beauvais Manor Healthcare & Rehab Center, LLC

4.      Beauvais Manor Healthcare & Rehab Center, LLC is a Missouri limited liability company.

5.      At all times relevant, Beauvais Manor Healthcare & Rehab Center, LLC owned, operated, and did business as Beauvais Manor Healthcare & Rehab Center, LLC which is a Missouri licensed nursing home in this county.

6.      At all times relevant, Beauvais Manor Healthcare & Rehab Center, LLC owned, operated, managed, maintained, and/or controlled – in whole or in part – Beauvais Manor Healthcare & Rehab Center, LLC.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

7.       Consequently, Beauvais Manor Healthcare & Rehab Center, LLC owed a duty to Decedent to use reasonable care for Decedent's safety while under Decedent's care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

### Beauvais Manor Property, LLC

8.       Beauvais Manor Property, LLC, is a Missouri company.

9.       At all times relevant Beauvais Manor Property, LLC, and/or individuals or entities acting on its behalf owned, operated, managed, maintained, and/or controlled – in whole or in part – Beauvais Manor Healthcare & Rehab Center, LLC – which is a Missouri licensed nursing home.

10.       Beauvais Manor Property, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled Beauvais Manor Healthcare & Rehab Center, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of the facility that could and should have been utilized to hire sufficient number of nursing staff.

11.       These actions and business decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

12.       Consequently, Beauvais Manor Property, LLC, owed a duty to Decedent to use reasonable care for Decedent's safety while under its care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

### SW Financial Services Company

13.       SW Financial Services Company, is an Illinois company.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

14.     At all times relevant, SW Financial Services Company, and/or individuals or entities acting on its behalf owned, operated, managed, maintained, and/or controlled – in whole or in part – Beauvais Manor Healthcare & Rehab Center, LLC – which is a Missouri licensed nursing home by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the facility.

15.     These actions and decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

16.     Moreover, SW Financial Services Company, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled Beauvais Manor Healthcare & Rehab Center, LLC by binding the nursing home to contracts with related parties –as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of the facility that could and should have been utilized to hire sufficient number of nursing staff.

17.     SW Financial Services Company, owed a duty to Decedent to use reasonable care for Decedent's safety while under its care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

18.     These actions and business decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

**Sheldon Wolfe**

19.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows

20.     Sheldon Wolfe has been at all times  relevant to this action a resident of Illinois.

21.     Sheldon Wolfe was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Beauvais Manor Healthcare & Rehab Center, LLC by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the facility.

22.     These actions and decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

23.     Moreover, Sheldon Wolfe operated, managed, maintained, and/or controlled Beauvais Manor Healthcare & Rehab Center, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of the facility that could and should have been utilized to hire sufficient number of nursing staff.

24.     These actions and business decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

25.     Consequently, Sheldon Wolfe owed a duty to Decedent to use reasonable care for Decedent's safety while under his care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

26.     Sheldon Wolfe willfully participated in the tortious acts that are the subject of this Petition.

### Albert Milstein

27.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows

28.     Albert Milstein has been at all times relevant to this action a resident of Illinois.

29.     Albert Milstein was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Beauvais Manor Healthcare & Rehab Center, LLC by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the facility.

30.     These actions and decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

31.     Moreover, Albert Milstein operated, managed, maintained, and/or controlled Beauvais Manor Healthcare & Rehab Center, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of the facility that could and should have been utilized to hire sufficient number of nursing staff.

32.     These actions and business decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

33.     Consequently, Albert Milstein owed a duty to Decedent to use reasonable care for Decedent's safety while under his care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

34.     Albert Milstein willfully participated in the tortious acts that are the subject of this Petition.

### Moshe Herman

35.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows

36.     Moshe Herman has been at all times relevant to this action an Illinois resident.

37.     Moshe Herman was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Beauvais Manor Healthcare & Rehab Center, LLC by exercising final authority over (1) staffing budgets; (2) the development and implementation of nursing policies and procedures; (3) the hiring and firing of the administrator; (4) appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the facility.

38.     These actions and decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

39.     Moreover, Moshe Herman operated, managed, maintained, and/or controlled Beauvais Manor Healthcare & Rehab Center, LLC by binding the nursing home to contracts with related parties – as defined by the Centers for Medicare and Medicaid Services – for dollar amounts that far exceeded the fair value of those services and resulted in funds being diverted out of the facility that could and should have been utilized to hire sufficient number of nursing staff.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

40.     These actions and business decisions had a direct impact on the care provided to all residents including Decedent and caused the injuries at issue in this lawsuit.

41.     Consequently, Moshe Herman owed a duty to Decedent to use reasonable care for Decedent's safety while under his care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

42.     Moshe Herman willfully participated in the tortious acts that are the subject of this Petition.

### Jamekah Garrett-Hughes

43.     Plaintiff incorporates by reference the allegations previously set forth and further allege as follows

44.     Jamekah Garrett-Hughes has been at all times relevant to this action a resident of the state of Missouri.

45.     At all times relevant, Beauvais Manor Healthcare & Rehab Center, LLC reported to the Centers for Medicare Services that Jamekah Garrett-Hughes served as the nursing home's "Managing Employee." In this role, Jamekah Garrett-Hughes was responsible in whole/or in part for managing, advising, and supervising all elements of the practices, finances, and operations of the nursing home.

46.     Jamekah Garrett-Hughes provided clinical support services to Beauvais Manor Healthcare & Rehab Center, LLC including the development of clinical policies and procedures, clinical education, and health information management services.

47.     Jamekah Garrett-Hughes was substantially engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the licensee, Beauvais Manor Healthcare & Rehab Center, LLC.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

48.     Consequently, Jamekah Garrett-Hughes owed a duty to Decedent to use reasonable care for Decedent's safety while under Decedent's care and supervision at Beauvais Manor Healthcare & Rehab Center, LLC.

49.     Jamekah Garrett-Hughes willfully participated in the tortious acts that are the subject of this Petition.

**JOINT VENTURE**

50.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows.

51.     All defendants other than Jamekah Garrett-Hughes, ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.   The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate Beauvais Manor Healthcare & Rehab Center, LLC;

    b.   The Joint Venture Defendants had a common purpose to operate Beauvais Manor Healthcare & Rehab Center, LLC;

    c.   The Joint Venture Defendants had a community of pecuniary interest in the operation of Beauvais Manor Healthcare & Rehab Center, LLC; and

    d.   The Joint Venture Defendants had an equal right to a voice in the direction of the operation of Beauvais Manor Healthcare & Rehab Center, LLC which gave the Joint Venture Defendants an equal right of control.

52.      There has been a close relationship between the Joint Venture Defendants at all times relevant.

**JURISDICTION AND VENUE**

53.   Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

54.   Venue is proper in this Court, because the tortious acts complained of occurred in the above referenced county in Missouri.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

55.   Defendants Beauvais Manor Healthcare & Rehab Center, LLC and Jamekah Garrett-Hughes are Missouri companies and or residents who committed tortious acts in the state of Missouri, thereby making jurisdiction in this Court proper.

56.   Pursuant to RSMo § 506.500.1(3), Beauvais Manor Property, LLC; SW Financial Services Company, Sheldon Wolfe, Albert Milstein, and Moshe Herman purposely availed themselves of the protections and/or benefits of the laws in Missouri by committing tortious acts within the state including, but not limited to, failing to ensure that that Beauvais Manor Healthcare & Rehab Center, LLC had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Decedent was a resident at Beauvais Manor Healthcare & Rehab Center, LLC, thereby making jurisdiction proper in this Court.

<u>AGENCY</u>

57.   Plaintiff incorporates by reference the allegations previously set forth and further allege as follows.

58.   The acts hereinafter described were performed by the agents, representatives, servants, and employees of defendants and were performed either with the full knowledge and consent of defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the defendants.

59.   Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Decedent.

**Defendants' Treatment of Resident**

60.   The MDS 10/3/19 shows high risk due to need of extensive assistance in bed mobility by 2 persons, total dependency in transfer, and extensive assistance in all other ADLs

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

61.     Care plan for skin integrity was initiated 4/3/18, "Assist with turning and repositioning every 2 hours."  This was never revised or updated.  However, the MDS on 10/3/19 and all subsequent ones indicate that he could not be "assisted" and needed staff to turn and reposition him. There was no documentation that a consistent turning and repositioning schedule at least every 2 hours in bed and at least every 1 hour in wheelchair was ever provided.

62.     Documentation Surveys pages 1080, 1087, 1095 indicate that there were multiple shifts when no bed mobility was provided at all, as well an no hygiene. Since T&P requires bed mobility, it is evident that T&P was not provided consistently.

63.     The MDS 10/3/19 indicates that a turning and repositioning program was not provided.

64.     Lack of hygiene is also evident from the development of MASD on the right buttock on 11/11/20. Opinions – development of the pressure ulcer(s)

65.     Pressure ulcers developed on or about 11/25/19 (left buttock) and 12/12/19 (right buttock) occurred due to failure to provide consistent turning and repositioning at least every 2 hours in bed and at least every 1 hour in the wheelchair, in addition to failure to provide adequate hygiene and incontinence care. The pressure ulcers development was avoidable because they were developed when no appropriate preventive interventions according to standards of practice were provided. Mr. Little did not have any condition that could have caused the development of pressure ulcers and his impairments were risk factors that were amenable to mitigation

66.     The pressure ulcer on the left buttock (on or about 11/25/19) was stage 3 with slough upon discovery indicating that it has developed a few days earlier and was not recognized timely.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

67. The right buttock pressure ulcer that was first documented on 12/12/19 was designated as "other" and not a pressure ulcer, was designated as "partial thickness" despite having granulation tissue indicating that it was a full thickness pressure ulcer, indicating lack of competence on part of the staff documenting the ulcer. In addition, the presence of granulation tissue indicates that the ulcer developed at least a few days earlier and was not recognized timely.

68. Pressure ulcer cannot heal and deteriorate if pressure is not offloaded. The only documentation of any turning and repositioning was on the day the right buttock ulcer was first documented "turned frequently." this did not meet the standard of care which required **complete offloading** of the left and right buttock pressure ulcers as follows:

   a. consistent turning and repositioning from side to side only at least every 2 hours in bed with additional weight shifts in between each full turning and repositioning, to assure that Mr. Little was never placed on his ulcers or his buttocks

   b. Repositioning in a wheelchair at least every 1 hour with weight shifts every 15-20 minutes as well as limitation of time in the wheelchair

69. There was no documentation in the record that any of the above interventions were provided. No new care plan was developed to include these interventions.

70. In addition, in order to prevent contamination and infection of the pressure ulcer, in a person with bladder and bowel incontinence, meticulous hygiene with incontinence are and diversion of stool from the ulcer need to be provided, including a check and change schedule of every 2 hours. There was failure to develop a new care plan and there was no documentation that such hygiene and incontinence care was provided, and the documentation

71. survey indicated that multiple shifts went by without the staff providing any hygiene acre to Mr. Little who suffered from incontinence.

72. The pressure ulcers were never assessed and documented after 12/18/19, and Mr. Little was never provided with the services of a wound care specialist.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

73.     The TARS indicate that numerous treatments were skipped and not provided.

Opinions – deterioration of the pressure ulcer

74.     The staff failed to provide Mr. Little with the following:

    a.   Pressure offloading from the pressure ulcers;

    b.   protection from fecal contamination of the ulcers with consistent and appropriate hygiene and incontinence care;

    c.   any assessments of the pressure ulcers after 12/18/19;

    d.   consistent treatments as ordered;

75.     As a result of the above deviations, the pressure ulcers did not heal, deteriorated, and became infected. By 2/3/20 the 2 pressure ulcers merged and were documented as a stage 4 sacrum pressure ulcer. The deterioration was avoidable, as Mr. Little did not have any condition or medication that could have prevented the healing of the pressure ulcers.

76.     The failure to provide Mr. Little with ADL care including bed mobility and hygiene, and the failure to provide him with appropriate interventions to prevent the development and to heal his pressure ulcers, constituted neglect and abuse as defined by CMS.

77.     The presence of an infected pressure ulcer was a focus of severe inflammation which caused Mr. Little to rapidly developed weight loss, likely due to a combination cachexia, anorexia and malnutrition. On 1/3/20 the MDS indicated that he needed supervision in eating and his weight was stable at 159 lbs. On 2/9/20 the MDS indicated that he needed extensive assistance in eating and his weight was 143 lbs. This rapid weight loss was related only to the inflammatory pressure ulcer as there was no other condition documented at SSM during the admission 2/9/20-2/20/20 to explain this rapid deterioration.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

78.     The infection in the pressure ulcer progressed to osteomyelitis as well as the development of severe sepsis associated with hypernatremia, dehydration, lactic acidosis, and delirium. This caused a need for 2 surgical debridements of the pressure ulcer, and the application of wound vac, which is frequently a painful intervention.

79.     Mr. Little suffered from pain in the pressure ulcer and due to its multiple treatments.

80.     Mr. Little suffered from severe deterioration in his functional condition due to the pressure ulcer as noted on the MDS dated 2/9/20 During the admission 2/20/20-3/418/20 he was totally dependent, and bed bound most of the time. He received antibiotics intravenously and a wound vac. The combined effects of severe inflammation, cachexia, weight loss, malnutrition, sepsis, delirium. acute kidney injury, surgery, antibiotic therapy, and continued wound and bone infection, all due to the pressure ulcer, were the sole and proximate cause of his death.

## Management of the Facility

81.     Most skilled nursing homes substantially derive their revenue and profits from the receipt of taxpayer dollars through the federally funded Medicare program.  Under Medicare, residents with higher acuity levels, i.e., a greater number and greater degree of illnesses, place higher demands for care and services on the facility and its staff.

82.     The rate at which the skilled nursing facilities accepting Medicare dollars for the delivery of nursing care and services, and according the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents confided to their facilities.  Thus, the higher overall and/or average acuity a facility has, the higher their reimbursement rates will be in general.

83.     For purposes of reimbursement, acuity, the amount of care a resident requires, is measured using a process established by The Center for Medicare Services ("CMS").

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

84.     This process includes a detailed Resident Assessment Instrument, completed by the facility for each resident as varying intervals depending on the resident's circumstance.

85.     The RAI form is known as a "MDS" (Minimum Data Set) and must be certified to CMS by a registered nurse on behalf of the facility.

86.     The MDS information provided by the facilities for each resident is processed and CMS assigns a corresponding "RUG/PDPM Score" which indicates a resident's acuity and reimbursement rate.

87.     CMS correlates this RUG, or acuity, score, to an amount of time necessary to meet the needs of that resident.  Averaging the acuity scores for an entire facility, this time is then represented as Hours Per Patient Day, or HPPD.

88.     This number describes the average amount of care giving time each resident in the facility should receive to sufficiently meet their needs.  For example, if a facility has an HPPD of 2.8, that means that each resident should receive 2.8 hours of care time devoted to meeting their needs.

89.     Just as there is a relationship between the RUG/PDPM scores HPPD, there is also a relationship between RUG/PDPM scores and reimbursement rates.

90.     The RUG/PDPM score, the HPPD and the Reimbursement Rates are all based upon the same information provided by the facilities, and the reimbursement rate is directly related to the amount of time a facility should spend caring for that resident.

91.     Therefore, the amount of money a facility receives is based upon the amount of time the facility should spend caring for that resident, all based upon the assessment information the facility certifies as accurate to CMS.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

92.     Acuity levels are reflected in the resident's "Resource Utilization Group" classification or "RUGs".  RUGs are mutually exclusive categories that reflect the amount of resources that will be needed in order to meet the needs of a particular resident in a skilled nursing facility.  They are assigned to residents based on data derived from an assessment tool referred to as a "Minimum Data Set" ("MDS").

93.     Based on this MDS, each resident's individual care needs (also called "acuity level") are assigned into a group signifying how much nursing or staff care the resident requires, called a Resource Utilization Group score, or "RUG" score.

94.     A completed MDS contains extensive information on a resident's nursing needs, activities of daily living impairments, cognitive status, behavioral problems, and medical diagnoses. This information is used to slot the resident into a RUG.

95.     RUGs are organized in a hierarchy from residents who will need the greatest amount of resources to residents who will need the least amount of resources during their stay at the nursing facility.  Residents with more specialized nursing requirements, licensed therapies, greater activities of daily living dependency, or other conditions will be assigned to higher groups in the RUG/PDPM hierarchy.

96.     MDS's are required to be prepared for each resident of a skilled nursing facility when they initially arrive at the facility and periodically after that depending on the course of the resident's medical progression.  At a minimum, an MDS is to be prepared for every resident in a skilled nursing facility on a quarterly basis.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

97.     The completion of an MDS by a skilled nursing facility is a part of the federally mandated process for clinical assessments of all residents in nursing facilities.  It is a core set of screening, clinical, and functional status elements reported on all residents of nursing facilities regardless of who is paying for the resident's stay in the nursing facility.

98.     MDS's need to be as detailed and comprehensive as possible so that they reflect all of the needs of each of the residents in the nursing facility.

99.     When done properly, the MDS provides a comprehensive assessment of each resident's functional capabilities and helps nursing facility staff identify all of the health problems of each of their residents.

100.     Each resident's RUG/PDPM score is contained in section Z of their MDS evaluation, meaning the total care needs of the residents in any facility at a specific time is available by totaling the residents' RUG/PDPM scores from their MDS evaluations.

101.     The RUG/PDPM Score also determines the level of compensation a skilled nursing facility will receive in order to provide the level of care necessary for each of their residents.

102.     Residents in higher RUG/PDPM categories place higher demands for care and services on the nursing facility and its staff.

103.     Providing care to residents in higher RUG/PDPM categories is costlier and is, therefore, reimbursed at a higher level.

### Levels of Necessary Care & Expected Staffing

104.     CMS is the federal agency that is tasked with regulating all nursing facilities in this country.  Through the years, CMS has sponsored multiple studies to determine the amount of time that RNs, LPNs, and CNAs in nursing facility spent caring for residents as well as other elements of resident care.

105.    Medicare has commissioned and made available to every nursing home studies and data showing the number of minutes of nursing and nursing aide care a person at a specific RUG/PDPM level should be expected to require, which Medicare calls "expected staffing."

106.    Because of these studies, CMS is able to set a number of hours of direct care that they expect to be provided to residents by RNs, LPNs, and CNAs based on the nursing facility's total acuity level.

107.    This expectation is expressed in terms of "hours per patient day" or "HPPD".

108.    With the information gleaned from the MDSs that are provided to CMS by each skilled nursing facility, CMS is able to determine an HPPD that is expected for each nursing facility in the country.  This is referred to as the "expected HPPD" or simply "expected staffing."

109.    When these RUG/PDPM scores are combined for all residents in a skilled nursing facility, the nursing home knows exactly how many minutes of nursing and nursing aide care should be provided, on average, to meet the expected care needs of their residents.

110.    The only way to determine the total acuity level and corresponding RUG/PDPM of each of the residents at a facility such as the Facility on any given day is by examining section Z of every MDS in effect on that day.

111.    It is only this empirical data from the MDS Part Z that is necessary to determine the acuity for any particular resident, and thus determine the staffing for a facility.

112.    It is not necessary to disclose or review any residents' information and the relevant information contained in Section Z of the residents' MDS forms can easily be redacted to prevent unnecessary disclosure of HIPPA protected health information.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

**Cost Reporting & Staffing Information**

113.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10". The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

114.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs. The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

115.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time period covered by that particular cost report. This number is referred to as the "reported HPPD".

116.     CMS allows the facilities to include all paid hours in the "reported HPPD." Thus, that number does actually reflect true direct care hours, but is inflated due to the fact that "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

117.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.

118.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work. This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the particular nursing facility.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

119.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period of time including a year, a quarter, a month, or a day.

120.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG/PDPM rates which reflect actual acuity and not simply a resident census.

121.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG/PDPM rates which reflect actual acuity and not simply a resident census.

## Undercapitalization/Underfunding at the Facility

122.     Beauvais Manor Healthcare & Rehab Center, LLC, Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

123.     Beauvais Manor Healthcare & Rehab Center, LLC, Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

124.     Upon information and belief, Beauvais Manor Healthcare & Rehab Center, LLC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

125.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

126.     Transactions directed by Beauvais Manor Healthcare & Rehab Center, LLC, Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there

### LEGAL BASIS FOR BEAUVAIS MANOR HEALTHCARE & REHAB CENTER, LLC BEAUVAIS MANOR PROPERTY, LLC; SW FINANCIAL SERVICES COMPANY; SHELDON WOLFE; ALBERT MILSTEIN ; and MOSHE HERMAN LIABILITY
#### Joint Venture/Enterprise

127.     Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein ; and Moshe Herman are collectively referred to herein as the "Corporate Defendants."

128.     The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

129.     These policies manipulate and control the physical and financial resources, and prohibit decision making at the Facility level.

130.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

131.    These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

132.    The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

133.    Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.

134.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

135.    The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

136.    The shared interest in the operation and management of nursing facilities;

137.    The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

138.    The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

139.    Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

140.    The Corporate Defendants share a common interest in the operation and management of nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

141.    The Corporate Defendants and Beauvais Manor Healthcare & Rehab Center, LLC took direct, overt and specific actions to further the interest of the joint enterprise.

142.    These actions were taken through a joint venture/enterprise or through the Corporate Defendants and Beauvais Manor Healthcare & Rehab Center, LLC's officers, directors, managers and or employees.

143.    The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

144.    Further, because the Corporate Defendants and Beauvais Manor Healthcare & Rehab Center, LLC were dominated by each other, these entities had an equal right to direct or control their venture as a whole, as well as to direct or control the operation and management of the Facility.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

**Direct Participation/Individual Actions**

145.     The Corporate Defendants were at all times material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Missouri. One such nursing home was the Facility where Resident was admitted for care and treatment.

146.     At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

147.     At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendants determined:

148.     The number of staff allowed to work in their chains of nursing homes including the Facility;

149.     The expenditures for staffing at the nursing homes including the Facility;

150.     The revenue targets for each nursing home including the Facility;

151.     The payor mix, and, census targets for each nursing home including the Facility;

152.     Patient recruitment programs and discharge practices at each nursing home including the Facility.

153.     All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

154.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

155.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

156.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

157.    Following the mandates, the Facility functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

158.    Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

159.    Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

160.    The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

161.     At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

162.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Missouri, and the federal government.

### Corporate Malfeasance

163.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

164.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

165.     These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and the Facility.

166.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

167.    During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, as a result of the acts, omissions, decisions and choices made by the Corporate Defendants in operating the Facility.

168.    During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died as a result of this failure.

169.    The Corporate Defendants manage, operate and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of, injuries to and death of Resident.

170.    The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

171.    Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Missouri and its residents;

172.    Created the dangerous conditions described by interfering with and causing the Facility to violate Missouri statutes, laws and minimum regulations governing the operation of said nursing home;

173.    Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of the Facility;

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

174.     Caused the harm complained of herein; and

175.     Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT I - (Wrongful Death v. All Defendants)

176.     Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

177.     Count I accrued after the August 28, 2015, effective date of the amendments to RSMo. § 538.210.1. *See Coover v. Moore*, 31 Mo. 574, 576 (Mo. 1862); *Cummins v. Kansas City Pub. Serv. Co.*, 66 S.W.2d 920, 929 (Mo. banc 1933); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957); *Boland v. St. Luke's Health System, Inc.*, 471 SW 3d 703 (Mo. 2015) (banc).

178.     At all times material hereto Resident was in a defenseless and dependent condition.

179.     As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

180.     At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

181.     At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

182.     At all relevant times, Defendants owed to Resident a legal duty to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

183.     These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

184.     These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

185.     These duties required Defendants to ensure that the Facility' nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

186.     These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

187.     Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

188.     Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition and Resident's risk of choking, vomiting, and aspiration;

    a.  Failing to adequately assess Resident's risk of developing skin breakdown and pressure ulcers, and risk of choking, vomiting, and aspiration;

    b.  Failing to timely, consistently, and properly monitor, assess and document Resident's physical condition;

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

c.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

d.  Failing to have a sufficient number of staff at the Facility to ensure Resident's needs were being met with regard to skin care and pressure ulcer prevention as well as Resident's risk of choking, vomiting, and aspiration;

e.  Failing to adequately monitor Resident for Resident's increased risk of pressure ulcers, choking, vomiting, and aspiration;

f.  Failing to provide adequate assistance and assistive devices and interventions to prevent Resident's skin breakdown, pressure ulcer, choking, vomiting, and aspiration;

g.  Failing to enact and carry out an adequate Care Plan in regard to Resident's increased risk for skin breakdown and pressure ulcers and Resident's risk of choking, vomiting, or aspirating;

h.  Failing to provide adequate preventative skin care to Resident;

i.  Failing to appropriately assess and maintain clean and dry skin where Resident developed a pressure ulcer;

j.  Failing to turn and reposition Resident every two (2) hours;

k.  Failing to utilize proper procedures for scheduling of turning and repositioning;

l.  Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

m.  Failing to prevent the development and worsening of Resident's pressure ulcers;

n.  Failing to adequately monitor Resident to ensure Resident did not choke or aspirate after vomiting;

o.  Failing to timely report Resident's changes in condition to a physician;

p.  Failing to carry out the instructions of Resident's physician;

q.  Failing to timely transfer Resident to a facility that could provide adequate care;

r.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

s.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers and risk of choking, vomiting, or aspirating in residents like Resident;

t.  Failing to ensure the nursing home was properly capitalized.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

189.     Defendants, as the owners, operators, and/or managers of skilled care nursing facilities licensed by the State of Missouri and accepting Medicare and Medicaid funds, were subject to regulations promulgated by the Missouri Division of Social Services and under the Social Security Act.

190.     While providing care and treatment to Resident, Defendants and their agents, servants and/or employees breached their duty to Resident and were guilty of acts of negligence and negligence, *per se*, in violating regulations governing residential care facilities including but not limited to the following:

a.   19 C.S.R. 30-85.042(3). The operator shall be responsible to assure compliance with all applicable laws and rules.  The administrator shall be fully authorized and empowered to make decisions regarding the operation of the Facility and shall be held responsible for the actions of all employees. The administrator's responsibilities shall include the oversight of residents to assure that they receive appropriate nursing and medical care;

b.   19 C.S.R. 30-85.042(6).  the Facility shall not knowingly admit or continue to care for residents whose needs cannot be met by the Facility directly or in cooperation with outside resources. Facilities which retain residents needing skilled nursing care shall provide licensed nurses for these procedures;

c.   19 C.S.R. 30-85.042(13).  the Facility shall develop policies and procedures applicable to its operation to ensure the residents' health and safety and to meet the residents' needs.   At a minimum there shall be policies covering personnel practices, admission, discharge, payment, medical emergency treatment procedures, nursing practices, pharmaceutical services, social services, activities, dietary, housekeeping, infection control, disaster and accident prevention, residents' rights and handling residents' property;

d.   19 C.S.R. 30-85.042(15).  All personnel shall be fully informed of the policies of the Facility and of their duties;

e.   19 C.S.R. 30-85-14.042(16). All persons who have any contact with the residents in the Facility shall not knowingly act or omit any duty in a manner which would materially and adversely affect the health, safety, welfare or property of a resident;

f.   19 C.S.R. 30-85.042(22).  the Facility must ensure there is a system of in-service training for nursing personnel which identifies training needs related to problems, needs, care of residents dehydration, total kidney failure, and infection control and is sufficient to ensure staff's continuing competency;

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

g.  19 C.S.R. 30-85.042(37).  All facilities shall employ nursing personnel in sufficient numbers and with sufficient qualifications to provide nursing and related services which enable each resident to attain or maintain the highest practicable level of physical, mental and psychosocial well-being.  Each facility shall have a licensed nurse in charge who is responsible for evaluating the needs of the residents on a daily and continuous basis to ensure there are sufficient trained staff present to meet those needs;

h.  19 C.S.R. 30-85.14.042(66). Each resident shall receive twenty-four (24)-hour protective oversight and supervision;

i.  19 C.S.R. 15-14.042(67).  Each resident shall receive personal attention and nursing care in accordance with his/her condition and consistent with current acceptable nursing practice;

j.  19 C.S.R. 30-85.042(79). In the event of accident, injury or significant change in the resident's condition, facility staff shall notify the resident's physician in accordance with the Facility's emergency treatment policies which have been approved by the supervising physician;

k.  19 C.S.R. 30-85.042(80). In the event of accident, injury or significant change in the resident's conditions, facility staff shall immediately notify the person designated in the resident's record as the designee or responsible party; and

l.  19 C.S.R. 30-85.042(81). Staff shall inform the administrator of accidents, injuries or unusual occurrences which adversely affect, or could adversely affect the resident. the Facility shall develop and implement responsive plans of action.

191.    Resident was a member of the class of persons intended to be protected by the enactment of the aforementioned regulations.

192.    The physical injuries Resident incurred were the type of injuries that the regulations were enacted to prevent.

193.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

194.     As a direct and proximate result of the individual and collective acts of negligence of all defendants as described above, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount in excess of $25,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT II - (Alter Ego v. Defendants Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman)

195.     Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

196.     For the purposes of this Count, Defendants Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman are hereinafter referred to as the "Alter Ego Defendants".

197.     The Facility and BEAUVAIS MANOR HEALTHCARE & REHAB CENTER, LLC as the operator ("Subsidiaries") are so dominated by the Alter Ego Defendants that the Subsidiaries are a mere instrument of the Alter Ego Defendants and are indistinct from the Alter Ego Defendants.

198.     In fact, the Subsidiaries are controlled and influenced by the Alter Ego Defendants in that the Alter Ego Defendants exercised complete control and domination over the Subsidiaries finances and business practices.

199.     Specifically, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

33

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

200.     Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused the Beauvais Manor Healthcare & Rehab Center, LLC to operate at a loss during the years Resident was at the Facility

201.     Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiaries caused Beauvais Manor Healthcare & Rehab Center, LLC's liabilities to exceed its assets by during the years 2018 and 2019.  Specifically:

202.     The Alter Ego Defendants own all or most of the capital stock of the Subsidiaries;

203.     The Alter Ego Defendants and the Subsidiaries have common directors or officers;

204.     The Alter Ego Defendants finance the Subsidiaries;

205.     The Alter Ego Defendants subscribe to all of the capital stock of the Subsidiaries;

206.     The Alter Ego Defendants caused the incorporation the Subsidiaries;

207.     Beauvais Manor Healthcare & Rehab Center, LLC has grossly inadequate capital;

208.     The Alter Ego Defendants pay the salaries and other expenses or losses of the Subsidiaries;

209.     The Alter Ego Defendants use the property of the Subsidiaries as its own; and

210.     The directors or executives of the Subsidiaries do not act independently in the interest of the Subsidiaries but take their orders from the Alter Ego Defendants in the latter's interest.

211.     Thus, the Alter Ego Defendants used the corporate cloak of the Subsidiaries as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendants' complete control and domination of the Subsidiaries depleted all of Beauvais Manor Healthcare & Rehab Center, LLC's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

212.     This undercapitalization and understaffing violated Beauvais Manor Healthcare & Rehab Center, LLC's duties under 19 C.S.R. 30-85.042 and the applicable standard of care owed by a nursing home operator or manager to the Facility's residents.

213.     As a direct and proximate result of the individual and collective acts of negligence of the Subsidiaries – and the Alter Ego Defendants – Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

214.     As a direct and proximate result of the individual and collective acts of negligence of Beauvais Manor Healthcare & Rehab Center, LLC – and the Alter Ego Defendants – Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

WHEREFORE, Plaintiff, prays for judgment against the Defendants in an amount in excess of $25,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT V - (Agency Liability v. Defendants Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman)

215.     Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

216.     For the purposes of this Count, Defendants Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman are hereinafter referred to as the "Agency Defendants."

217.     The Facility held the power to alter the legal relations between the Agency Defendants and third parties.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

218.	The Facility is a fiduciary with respect to the matters within the scope of the agency – in this case the operation of the nursing home.

219.	The Agency Defendants have the right to control the conduct of the Facility with respect to matters entrusted to the Facility.

220.	Specifically, the Agency Defendants possessed the right to ensure that the Facility, had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was at the Facility.

221.	Consequently, the Agency Defendants along with the Facility owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility.

222.	The Agency Defendants are liable because the Facility breached its duties by failing to ensure the Facility had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, staffed; and that staff received adequate training and supervision while Resident was a resident at the Facility.

223.	As a direct and proximate result of the Facility' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered damages, including but not limited to pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

224.	As a direct and proximate result of the individual and collective acts of negligence of the Facility, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

WHEREFORE, Plaintiff, prays for judgment against the Agency Defendants in an amount in excess of $25,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

### COUNT VI - (Corporate Negligence v. Defendants Beauvais Manor Healthcare & Rehab Center, LLC; Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman)

225.    Plaintiff incorporates by reference all of the foregoing allegations in this Petition as though fully set forth herein.

226.    For the purposes of this Count, Defendants Beauvais Manor Healthcare & Rehab Center, LLC; Beauvais Manor Property, LLC; SW Financial Services Company; Sheldon Wolfe; Albert Milstein; and Moshe Herman are hereinafter referred to as the "Corporate Negligence Defendants."

227.    Plaintiff pursues this claim for Corporate Negligence pursuant to *LeBlanc v. Research Belton Hosp.*, 278 S.W. 3d 201 (Mo. App. W.D 2008).

228.    At all relevant times, the Corporate Negligence Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

229.    These duties required the Corporate Negligence Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

230.    These duties also required the Corporate Negligence Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

Electronically Filed - City of St. Louis - June 28, 2021 - 02:25 PM

231.    As described above, the Corporate Negligence Defendants, failed to ensure the Facility had a sufficient number of staff and capital in during Resident's stay at the Facility.

232.    As a direct and proximate result of the Corporate Negligence Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at the Facility, Resident suffered severe pain, anxiety, mental distress, and death.

233.    As a direct and proximate result of the Corporate Negligence Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at the Facility, Plaintiff, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

234.    WHEREFORE, Plaintiff, prays for judgment against the Corporate Negligence Defendants in an amount in excess of $25,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

<u>**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**</u>

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:        */s/ Jonathan Steele*

Jonathan Steele  MO #63266
Kevin Chaffee    MO #63462
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
kevin@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF(S)